IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CLARENCE TOLLIVER,

    Petitioner,   No. CIV S-05-2125 GEB GGH P

  vs.

TOM CAREY, et al.,

    Respondent.   FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

    Petitioner is a state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In 1981 petitioner was convicted of second degree murder and sentenced to 17 years to life. Following petitioner's *tenth* parole suitability hearing on February 20, 2004, the California Board of Prison Terms (BPT) found petitioner suitable for parole. Governor Arnold Schwarzenegger reversed that decision.

    In the instant action, petitioner argues that Governor Schwarzenegger's decision, and hence the later state court decision, was not supported by some evidence and that the Governor failed to consider all relevant information. After carefully reviewing the record, the court recommends that the petition be granted.

/////

1

II. Anti-Terrorism and Effective Death Penalty Act (AEDPA)

The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this petition for habeas corpus which was filed after the AEDPA became effective. Neelley v. Nagle, 138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997). The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. Id. at 1519. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue.  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

Petitioner filed habeas petitions raising the claims raised in the instant petition in the Superior Court, California Court of Appeal and California Supreme Court.  Petition, Exhibits M, N, O.  The Superior Court and California Court of Appeal issued short, written decisions denying petitioner's habeas petitions.  Id., Exhibits M, N.  The California Supreme Court denied petitioner's habeas petition without comment or citation.  Id., Exhibit O.  When reviewing a state court's summary denial of a claim, the court "looks through" the summary disposition to the last reasoned decision.  Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000).

/////

## III. Background

The circumstances of the underlying offense are relevant to the instant petition. The probation officer's report contains a discussion of the facts which are undisputed:

> Present Offense:
>
> Defendant, Clarence Tolliver, and Theodore James Johnson, were arrested on September 25, 1979, at approximately 12:30 a.m., at 123 West 79th Street, Los Angeles, California, by members of the Los Angeles Police Department, 77th Street Division and booked on violation of 187 Penal Code (Murder). Both defendants were subsequently charged in the information with violation of 187 Penal Code (Murder), plus an allegation of the use of a hand gun pursuant to 12022.5 and 1203.06(A)(1) Penal Code.
>
> On May 30, 1980, Department 100, defendant Johnson made a plea of guilty to violation of 187 (murder), second degree. On December 4, 1980, Department 122, probation was denied, and defendant Johnson was sentenced to California State Prison.
>
> Defendant Clarence Tolliver appeared in Department 122, on February 4, 1981, at which time he was found guilty by jury of violation of 187 Penal Code (murder), second degree. The jury also found that defendant did personally use a firearm, a hand gun, pursuant to section 12022.5 and 1203.06(A)(1) Penal Code.
>
> The essential circumstances of the case as shown in the district attorney file are as follows: investigating officers were notified at their respective residences that a homicide had occurred at 116 East 76th Place, Los Angeles. Officer Bunch and Officer Ryan proceeded to that location. They observed 18-year-old victim Michael Bradford lying in the rear driveway at the address indicated and from talking to witnesses, obtained a description of the vehicle and one of the individuals named as a suspect. Various witnesses indicated that they had heard several shots occurring some time between 10:07 and 10:20 p.m. They had observed two male blacks leave from the alleyway and enter a late model, black Cadillac and drive away from the scene. Officers patrolling the immediate vicinity observed a 1978 black, two door Cadillac with no license plate but the vehicle dealer "Martin Cadillac" driving south bound on Main Street. This vehicle then made a right turn on 79th Street and pulled into the driveway at 123 West 79th Street. Officers positioned their police vehicle behind the suspect and took the defendants into custody.
>
> When questioned by the police, defendant stated that "at about 9:45 p.m., a friend called and said 'Eight Ball' and some 'east coast crips' were going to shoot up Ted's girlfriend's apartment. Ted had his .38 revolver and I had a 357. We parked west bound on 77th east of Main. Ted is driving the car. I saw a guy standing on the north east corner of 77th and Main. He was dressed like an 'east coast cripp.' As we got out I see a guy standing with a 10-speed bike near the north east corner. Ted yells, 'who is that guy.' I stop by the alley. Ted continues to walk toward the guy on the corner. The guy that was standing there started running north bound and then east bound by the apartments. The guy on the 10-

4

speed opened up and started shooting at the guy running. Ted was at the corner and he started shooting, too, at the guy running. I saw Ted jump back. I don't know, if the guy running was shooting too. I ran between the church up to main street but I didn't see anything. I ran back to the back house and heard more shots. I saw the guy running north bound in the alley and I fired three shots. Ted was behind me but he did not shoot. I did not know where the guy on the 10-speed was. I didn't see the guy get hit. We ran back to my car and split. I didn't see the guy on the 10-speed at all anymore. We drove down an alley off 74th Street between Main and San Pedro. I got out of the car and threw my gun. I don't know what Ted did with his.

Defendant's Statement

Defendant has not provided the probation officer with a written statement. Orally, defendant explains that he purchased his 357 magnum pistol from a guy at work for $100. He was selling it and I never had one, so I bought it. It was for the protection of my house. I had it for three years. I would fire it on New Years Eve. I have known Johnson for 10 years. Earlier that day, on September 24, 1979, me and Sandra were coming from 69th Street and San Pedro in the Cadillac. Some guys came up to the car and threw some rocks and bottles at my car and drove off. They were the East Coast Cripps. I had seen them before. Later that night, a guy came to the house and yelled "Clarence, Clarence," and said that the Cripps were getting ready to shoot up my house on 76th and Main Street. This was a couple of blocks away. Johnson was with me at the time. He left, got my keys and went to the car. I got my pistol. I did not have any intention to shoot or kill anybody. I know I have a big gun, it'll do a lot of damage. We drove to 77th Street between Main and San Pedro. We parked west bound off an alley. He got out first, and started to go to the corner. I got out when he was near the corner. I got to the mouth of the alley. He said there was something there and started shooting. I saw a guy run first. A guy on a 10-speed bicycle started shooting in the direction of the guy who was running. I saw Ted take off running. After the first person, I was surprised at him shooting. I got down. It was more like he was trigger happy, before I could stop him, he emptied the gun. (Co-defendant Johnson). He also looked like he got hit by a bullet. I ran to Main Street looking for him. Then I ran back to the side of the house where a witness had seen what happened. I heard more shots. I saw more guys running out of the alley. I raised my arm and shot about four times in their direction, but over their heads. They were running. Didn't aim directly at them. I don't believe I'm guilty. I had heard bullets coming at me. Johnson's action was an independent action, I'm not guilty.

Petitioner, Exhibit B, pp. 5-9.

IV.  Discussion

Respondent first argues that the court lacks subject matter jurisdiction to consider the petition because petitioner has no liberty interest in being released on parole. Respondent confuses the subject matter jurisdiction of the court with failure to state a cognizable claim. Clearly, the court has subject matter jurisdiction over petitioner's habeas corpus claim pursuant

1  to 28 U.S.C. § 2254.  Federal question jurisdiction exists if the complaint (or petition) purports to
2  state a claim under federal law regardless of the validity of the claim.  Wheeldin v. Wheeler, 373
3  U.S. 647, 83 S. Ct. 1441, 1444 (1963).  Only if the stated federal claim is so wholly insubstantial
4  that even a preliminary review of the merits is not required does the federal court not have
5  jurisdiction.  Bell v. Hood, 327 U.S. 678, 66 S. Ct. 773 (1946).  It is not every arguably failed
6  claim that deprives the district court of jurisdiction.  Here, petitioner properly invoked § 2254 for
7  the basis of his habeas claim.  His contentions that he was denied due process in the parole
8  setting process are not so insubstantial so as to deprive the court of jurisdiction.
9         Respondent next argues that California law does not give rise to a federally
10 protected liberty interest in parole release.  The Ninth Circuit rejected this argument.  Sass v.
11 California Bd. of Prison Terms, 461 F.3d 1123 (9th Cir. 2006).
12         The petition raises two claims: the Governor's decision is not supported by some
13 evidence and the Governor failed to consider all relevant information.  These claims are really
14 one in the same.
15         Under California law, in considering whether to reverse a decision by the BPT the
16 Governor considers the same factors which the parole authority is required to consider.  Cal.
17 Const., art. V, § 8(b); Cal. Penal Code § 3041.2; In re Rosenkrantz, 29 Cal.4th at p. 616, 660,
18 128 Cal.Rptr.2d 104, 142 (2003).  Accordingly, this court will apply the same standard used in
19 evaluating the sufficiency of evidence to support decisions by the BPT in its evaluation of the
20 sufficiency of evidence of the Governor's decision.
21         In the parole context, the requirements of due process are met if "some evidence"
22 supports the decision.  Id. at 1128-1129.  In reviewing the Govornor's decision, the court
23 analyzes whether the factors relied on by the Governor, set forth in the relevant regulations, are
24 supported by some evidence.
25         Cal. Code of Regulations, section 2402(c), sets forth the circumstances tending to
26 show unsuitability.  The court lists those of significance here:

(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style manner.

*****

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

*****

*****

(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

Section 2402(d) sets forth the circumstances tending to indicate suitability:

(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to the victims.

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for the Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome . . .

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

In Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003) the Ninth Circuit indicated that a continued reliance on an unchanging factor such as the circumstances of the offense could result in a due process violation.  Biggs was serving a sentence of twenty-five years to life following a 1985 first degree murder conviction.  In the case before the Ninth Circuit, Biggs challenged the 1999 decision by the BPT finding him unsuitable for parole despite his record as a model prisoner.  334 F.3d at 913.  While the Ninth Circuit rejected several of the reasons given by the BPT for finding Biggs unsuitable, it upheld three:  1) petitioner's commitment offense involved the murder of a witness; 2) the murder was carried out in a manner exhibiting a callous disregard for the life and suffering of another; 3) petitioner could benefit from therapy.  334 F.3d at 913.

The Ninth Circuit cautioned the BPT regarding its continued reliance on the gravity of the offense and petitioner's conduct prior to the offense:

> As in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law.  Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of his offense would raise serious questions involving his liberty interest.

\\\\\

\\\\\

334 F.3d at 916.[1]

In 2004 the BPT found petitioner suitable for parole. The transcript from the 2004 hearing contains the decision:

> The Panel has reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is suitable for parole and would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison. The prisoner has a stable social history, as exhibited by reasonably stable relationships with others. For instance, he has been married for over 20 years. Prior to that he was raised by his mother, continues to have relationships with his family members. While imprisoned he has enhanced his ability to function within the law upon release through participation in educational programs. He, in 1975, graduated from high school prior to coming into CDC. After that, he maintained a high TABE score, apparently 12.9 overall, which is the highest he can attain. Excuse me. And he completed college courses while in the institution. He has enhanced his ability to function through self-help programs including the VORG program, Anger Management. These are the most recent. Narcotics Anonymous for about 10 years. Previously, personal development courses, the CAT X program, which is an extensive program. He has been a participant, ongoing participant in Muslim studies, and previously in Rational Behavior Thinking, Stress Management, Reality and Decision Making amongst others. He has enhanced his ability to function through vocational programs in completing computer repair, data processing and sewing machine

---

[1] Of course, what <u>Biggs</u> was struggling with was the apparent arbitrariness in revisiting the parole suitability decision using the very same factors which were considered when a petitioner was involved in the criminal process. That is, in ultimately determining the sentence a murder defendant should receive, at the inception of the process, the district attorney exercises some discretion, utilizing factors such as the manner in which the crime was committed, motive, previous criminal history and the like, in reaching a charging decision within the parameters of the law. If a case is bargained out of the process with a determination that based on law and circumstances an indeterminate term of incarceration with the possibility of parole is the appropriate sentence, again, the very same factors set forth in the parole suitability regulations are the factors obviously considered at plea bargaining time – again within the parameters of the law. If the case goes through trial and then to sentencing, the factors will be considered yet again at sentencing time. A sentence is then imposed with the settled expectation that the possibility of parole is not a sham, but that a meaningful possibility of parole exists. And, the possibility, if meaningful, has to be based upon future conduct as the past cannot be undone, and was considered already. The California parole regulations have the potential, nonetheless, to allow for reinstitution of the sentencing process such that if a commissioner or a governor does not like the fact that a certain defendant was granted parole, the established possibility of parole evaporates simply because of a latter day redetermination that the crime was egregious, or the motive was trivial etc.– something that was obviously apparent at the time the possibility of parole sentence was issued. Thus, we have cases, like the present one, where the parole suitability parole is denied for nine or more times based on a determination that the seriousness of the crime, or a related factor, precludes the possibility of parole. While it is perfectly fine to have a system where no possibility of parole exists for any murder, it is not perfectly fine to have a parole system that is based on misrepresentation.

9

repair. He has also enhanced his ability to function through institutional job assignments including serving at a variety of capacities as a clerk, as the Muslim clerk in academics, and as a disciplinary clerk. He's also participated in food service, served as a porter, and currently has an assignment as a teacher's aid. He has received exceptional work reports. Because of maturation, his growth, his greater understanding, not only of himself but of the commitment offense, he has a reduced probability of recidivism. And he has realistic parole plans, which include a job offer and family support. He has maintained that family support over the length of his incarceration. He has maintained positive institutional behavior, having received only one 115 in nearly 23 years of incarceration, and that certainly indicates a significant improvement in self-control. The psychological report, dated August 19, 2002, which is the most recent, is by Dr. John Rouse, R-O-U-S-E. Dr. Rouse believes that the inmate would pose a low degree of threat to the public. Therefore, that report seems to support release. He writes, "The fact that he accepts responsibility for the magnitude of his offense and has expressed significant remorse also causes his risk of dangerousness to be assessed as low." The previous report was written by Dr. Charles Taylor, T-A-Y-L-O-R. And Dr. Taylor interviewed Mr. Tolliver on May 25, 2001. The actual report is not dated. The doctor writes,

"Since incarceration he has demonstrated a commitment to self-improvement personally, educationally and vocationally, and to assume responsibilities for himself and others. He appears well-connected to family members, including a wife, daughter and son. He demonstrates a positive, confident attitude. He has not evidenced emotional discontrol. He appears to be committed to religious pursuits and the ideals that he represents. Together these factors speak positively about his chance–chances of success and freedom from violence on the streets."

Therefore, that also appears to support release.

Petition, Exhibit C, decision, pp. 1-4.

Governor Schwarzenegger's decision reversing the BPT's 2004 suitability finding states, in relevant part,

In its 2004 decision to grant parole, the Board concluded that Mr. Tolliver "has a stable social history, as exhibited by reasonably stable relationships with others." Mr. Tolliver has been married for more than 20 years and has maintained some solid relationships while in prison. But he had a rather unstable life before prison. As a juvenile, he was committed to a forestry camp for assault with a deadly weapon. He fathered a son at age 17 by a 15 year old girl and subsequently became involved with another female and fathered another son. He started using marijuana regularly at the age of 18, and in the year before the murder started selling marijuana on the side even though he had been employed steadily since finishing high school. He was convicted as an adult for sale of marijuana, resulting in a sentence of 60 days in the county jail and probation for three years. Mr. Tolliver had no other history of violence or assaultive behavior when he murdered Mr. Bradford.

\\\\\

Mr. Tolliver has been in prison since 1984 and throughout this time has received only disciplinary for a serious rules violation in 1997. He has worked in prison to enhance his ability to function within the law upon release. He has attended college classes and has gained vocational certificates for sewing machine repair, computer repair and data processing. He has also participated in a number of self-help programs, including CAT-X, Anger Management and Narcotics Anonymous. He has laudatory reports for his participation in the Muslim Community, and he has consistently received positive work reports for his performance in a variety of institutional jobs. Likewise, he has received positive mental-health evaluations, established and maintained ties with various family members while in prison, and made realistic housing and work plans for himself upon parole. His institutional efforts and conduct generally demonstrate a change in attitude from callous killer to a maturing adult working to re-enter society as a law-abiding citizen. Mr. Tolliver has come a long way.

For many years, however, Mr. Tolliver blamed the murder on his crime partner. Mr. Tolliver's argument at trial was that he could not have fired the fatal shot because his arm was raised upwards as he was shooting. According to the autopsy report, the bullet that caused Mr. Bradford's death entered at the right back and angled up to pierce his lung. Another defense contention, also rejected on appeal, related to the issue of whose bullet caused the victim's death, the .357 magnum or the .38 revolver. In the Probation Officer's Report, Mr. Tolliver indicated that his crime partner was "trigger happy" and that "[his partner's] bullet killed him...seeing the bullet entries, I can't say it was my gun. So, I don't know who actually did it, but I know I am involved and I take that responsibility of doing it." He also expressed at the hearing remorse for Mr. Bradford's death. While Mr. Tolliver seems to have made some progress in this area, he still seems to think it matters to some extent whose gun fired the fatal shot. It does not.

But Mr. Tolliver and his partner committed an especially grave second degree murder by chasing and gunning down an unarmed, fleeing, innocent young man. And the reason for it, according to Mr. Tolliver, is because he had an earlier confrontation with a gang member and thought Mr. Bradford was a member of that gang. Even if this were true, Mr. Bradford was running away when he was slain. He posed no threat to Mr. Tolliver or his partner. This was nothing short of a calculated, cold-blooded murder. Mr. Tolliver's explanation at the 2004 parole hearing that he fired in Mr. Bradford's direction to "keep him running" is disingenuous, and his statement at the same hearing that he stopped shooting at Mr. Bradford once he realized he was firing in the direction of the home where his crime partner's mother lived demonstrates a certain level of calculated detachment. It also demonstrates a realization that the natural consequences of his actions were dangerous to life and he knew his conduct put others at risk. Likewise, the tip given to Mr. Tolliver–that Crips members were going to shoot up his place–in no way mitigates Mr. Tolliver arming himself and his younger crime partner and going in search of the gang members. Mr. Tolliver went beyond the minimum necessary to sustain a conviction for second-degree murder and the gravity alone of his crime is a sufficient basis on which to conclude at this time that Mr. Tolliver is unsuitable for parole. The Los Angeles County District Attorney's Office, a representative of which appeared at Mr. Tolliver's 2004 parole hearing, agrees.

> Mr Tolliver is no doubt on the right road. But the standard by which I am governed is whether I believe his release from prison to parole at this time would pose an unreasonable risk of danger to society. And after carefully considering each of the factors the Board is required to consider, I do. Accordingly, I REVERSE the Board of Prison Terms' 2004 decision to grant parole to Mr. Tolliver.

Petition, Exhibit L.

Governor Schwarzenegger found petitioner unsuitable for parole based on essentially three reasons: 1) petitioner had an unstable social history, § 2402(c)(3); 2) petitioner did not accept responsibility for the crime; and 3) the circumstances of the offense.

In finding that petitioner had an unstable social history, the Governor relied solely on events occurring in petitioner's life prior to his conviction. Following his conviction, petitioner married his wife, Faye, in 1984. Petition, Exhibit C, p. 22. Petitioner and his wife had a daughter. Id., p. 23. Petitioner planned on living with his wife upon his release. Id., p. 30. The record before the BPT in 2004 also contained letters from his brother-in-law and sister demonstrating family support. Id., pp. 25-27.

While petitioner's social history prior to his incarceration was unstable, his social history following his conviction was quite stable, as demonstrated by his strong and steady ties with family members. Based on petitioner's stable social history following his incarceration, the unchanging factor of petitioner's unstable social history prior to his conviction lost any predicative value in determining whether petitioner was suitable for parole. Accordingly, the court finds that the Governor's continued reliance on the unchanging factor of petitioner's long-ago unstable social history prior to his incarceration violated petitioner's right to due process.

Perhaps the most important factor, at least the most emphasized by the Governor, was petitioner's alleged inability to take sufficient responsibility for the crime. However, the answers upon which the Governor relies were taken out of their proper context. It so happened at the hearing that a Commissioner asked petitioner certain very fact-bound questions to which petitioner responded. The questions were not directly, or even subtly, seeking to elicit

petitioner's conclusion about his responsibility for the killing, but were designed to clear up some factual issues in the Commissioner's mind.  For example, the question posed in the below quoted excerpt from the hearing simply asked whether "they" (the jurors or some other fact finder) ever determined whether the fatal shots came from his weapon.  However, the Governor takes petitioner's responsive answer, essentially there was no way to determine such for sure, as an attempt at distancing himself from responsibility.  This is unfair because petitioner was simply answering a question posed to him.  What would the Governor have petitioner do – answer in a false manner – that the forensics undoubtedly proved the shots came from petitioner's gun when he truly believed that the answer was otherwise?  If the Governor had some factual basis for suggesting that petitioner did not tell the truth to the question, *that* would establish a basis for doubting petitioner's acceptance of responsibility, but the Governor points to no such basis.  In sum, all the Governor's letter suggests is that at the next hearing, petitioner should not answer such factual questions to the best of his knowledge and truthfully, but simply answer them in a manner acceptable to the Governor's responsibility notions.

At the 2004 hearing, petitioner testified that he was responsible for the killing even though it could not be proven whose bullet killed the victim:

> Q   [Commissioner Lavin after characterizing the autopsy report]
> ... During trial did they designate whether all four of these shots came from your weapon?
>
> A   During the trial, I testified, and can't say it was proven, but I testified that my arm being extended above my shoulder in an upward–upward manner. During the trial, it was said that he was shot in the lower back, as you said, and the bullet traveled, and I believe punctured a lung or something that caused his death. My lawyer at the time, Robert Badge, at the time, was defending on the fact that in the position of my arm that these couldn't have been my bullets that killed him, and the caliber of the gun that I had.  But, however, I am a participant in this.  I'm not shifting blame to say I didn't do it, because I went there, and I did participate in the shooting. He ended up dead, and that's my responsibility that I take on fully. Because of the time that has been done now between me and Mr. Johnson, I can't say his bullet killed him.  And from the trial of seeing the bullet entries, they were very small holes, I can't say it was my gun.  So, I don't know who actually did it, but I know I am involved and I take that responsibility of doing it.

Petition, Exhibit C, p. 17.

1   Dr. Rouse's psychological report, on which the 2004 panel relied, states that
2   petitioner took appropriate responsibility for the crime: "Mr. Tolliver acknowledged culpability
3   for the crime. He was not at all defensive or minimalist as it related to the crime. His manner
4   was one of remorse and an acceptance of blame." Petitioner's May 1, 2006, supplemental
5   briefing, exhibit S.

6   The Governor also faulted petitioner for his explanation that he fired at the victim
7   as the victim was running away. The Governor stated that the murder was "calculated, cold
8   blooded," suggesting that petitioner's explanation that he fired at the victim as he was running
9   away demonstrated an unwillingness to admit that he intended to kill.

10  At the 2004 hearing petitioner described his participation in the murder:

11  Petitioner: It was–on September 24th I had a confrontation with a gang member of East Coast Crips about four o'clock, four or five o'clock that evening. And later
12  that night I was at an apartment, I was at my apartment, and I was–an individual came and told me that these guys were down there. Me and Mr. Johnson, we
13  armed ourselves and went down to that place to an apartment together. I paid the rent at this particular place. So, when we went down there and we got there, Mr.
14  Bradford was standing on the corner, and it appeared that they were there. We mistakenly took Mr. Bradford as being a member of this situation that we were
15  involved in, and shots broke out. I shot, and Mr.–the tragedy, Mr. Bradford ended up being killed. The gang members that were–that was–I was told was there was
16  not there, and chaos just broke out when the shots were being fired.

17  Presiding Commissioner Lawin: Who fired the first shots, do you know?

18  Petitioner: No, not exactly I don't know. I was–I mean, not to point blame on Mr. Johnson, but Mr. Johnson was shooting, there was another individual there
19  shooting, and then I shot last. My participation was I was shooting last as Mr. Bradford was running away.

20  Presiding Commissioner Lawin: *And were shots being fired at you?*
21
    Petitioner: No, not at me, no.
22
    Presiding Commissioner Lawin: Why, then, did you fire at all?
23
    Petitioner: I fired in the sense of what I felt was to keep the guys running, and
24  when I fired at Mr. Bradford, to keep him running away from the situation because, as I say, shots were being fired, and I didn't know where they were
25  coming from, who were actually doing all the shooting, but shots did occur. And so, when I saw him at that time, it turned out to be Mr. Bradford, but at that time
26  when I seen the individual running I fired in his direction to keep him running.

> And as the night went on, that's when I found out it was Mr. Bradford that had been shot, and I didn't know him.

Answer, Exhibit C, pp. 14-16.

First degree murder requires a willful, deliberate and premeditated killing with express malice aforethought. CALJIC 8.20. However, petitioner was convicted of second degree murder. Second degree murder can be found either through 1) an intentional killing with malice aforethought but without deliberation and premeditation, i.e. express malice (CALJIC 8.30), or 2) an unintentional killing which resulted from an intentional act whose natural consequences were dangerous to human life, with knowledge and conscious disregard of the danger, i.e. implied malice (CALJIC No. 8.31).

Governor Schwarzenegger's opinion indicates that he found petitioner unsuitable for parole because he did not admit to first degree murder, i.e. an intentional and premeditated killing: "This was nothing short of a calculated, cold-blooded murder." Petition, Exhibit L. Petitioner's second degree murder conviction did not require that he intend to kill the victim. Petitioner's testimony that he fired in the direction of the victim to keep him running away supported a second degree murder conviction based on implied malice. Petitioner's testimony did not attempt to mitigate his role in his conviction for second degree murder.

Again, "who fired the first shots," is a factual question to which the possible answers are – I shot first, or last. If there is evidence to dispute that petitioner shot last, i.e., to suggest that petitioner is fantasizing about the murder, it has not been presented here. The last question "why did you fire at all," is a bit more probing into petitioner's mindset, as opposed to merely setting the scene, but nothing in petitioner's response can fairly be argued as a non-acceptance of responsibility. Petitioner understands that whether he was aiming at the deceased or not, he is responsible along with others for the end result.[2]

---

[2] The Governor also stated that "for many years," petitioner blamed the murder on his crime partner. However, the only evidence cited is petitioner's trial strategy and the probation

15

At the conclusion of the hearing, petitioner made further statements regarding his understanding as to his role in the murder:

> There were many things that led up to that. The reason I more or less was saying I was not guilty being–going through a trial, because like I took this to a jury trial, and having the lawyer defending me and saying that I wasn't guilty and telling me the way my arm was positioned there is no way you could have done this with the gun recoiling how ever many feet in the air. And with his perception of it, I took on the belief that, no, I actually didn't kill Mr. Bradford. So, after nine years of incarceration on my first Board appearance, the Commissioner, Ms. O'Connell, she asked me that question and it was–it had to be more probed out of me. And the first time when I answered, that was my words, yes, I'm guilty. And she asked me again, and then that's when I said, yes, I guess I am guilty. I was found guilty by a court. And she told me that I needed to do some soul searching to understand the magnitude of this crime and my participation. So, I was sent to the CAT X program, and in that extensive program I came to grips with being guilty of my participation, more or less, just for my participation of being guilty. It's still not in the actual (inaudible) it was me that did it. But as time went on and as studying my religion, going to college, going to the different groups, the different intern groups that I've went to, and Rational Behavior, Anger Management, it just came to me that this is me. I was there. I did it and no matter what participation Mr. Johnson had in it, I was still there. And me being older than him, it's a possibility and most likely my influence on him was–encouraged him. So, it just came to me that you're responsible for this and there is no one else to blame but you. I can't blame my environment. I can't blame no one but me. So, at one time, it's in my file, I even wrote a letter in trying to apologize to the Bradford Family, and I sent it to the District Attorney's Office of Los Angeles, and I forgot the lady's name. She was a district attorney that came. She said she actually received the letter, but she felt it was inappropriate to forward it to the family. But just in knowing self and coming into respect for the human being, understanding my participation in the community, being in my community, being a part of the problem where I come now to want to be part of the solution.

Id., pp. 45-46.

The court also observes that at the 2004 hearing petitioner was asked how he felt about having taken the victim's life:

> Oh, very, very regretful. It's a tragedy that I live with everyday, especially in the sense of coming into knowing myself, coming into maturity of being a man and understanding the ramifications of it all now, the effects that it had on his family and my family. Being a participant in the VORG program, the Victims Offenders Reconciliation Group, and knowing even in learning from that, going through the different psychologists through the CAT X Program, it's a tragedy that something

---

report. Such does not substantiate the implied conclusion that petitioner has for "many years" not accepted adequate responsibility. It only substantiates that petitioner may have had this notion at the time of his trial.

16

> I've done in my life that I can't undo, so I have to live with it every day. But this–for him–for to know an innocent bystander, not that even if he was involved taking a life is something that's a terrible thing to do or (inaudible) to live with every day. So—

Id., p. 19.

Based on this testimony and the other testimony cited above, the court finds that the Governor's conclusion that petitioner did not adequately accept responsibility for his crime was not supported by some evidence.

Finally, the Governor reversed the BPT's suitability finding based on the circumstances of the crime. As discussed above, the Governor was reviewing petitioner's tenth suitability hearing, petitioner had been incarcerated for over 20 years and had an excellent prison record. For these reasons, the court finds that the unchanging factor of the circumstances of petitioner's offense no longer had predictive value in determining whether petitioner was suitable for parole. Accordingly, the Governor's continued reliance on the unchanging factor of petitioner's unstable social history prior to his incarceration violated petitioner's right to due process.

But, the undersigned emphasizes that the above analysis is not sufficient in itself to warrant a granting of the habeas petition. The court must look to the written decisions of the Superior Court and the appellate court to determine if these are an *unreasonable* application of the facts to the due process law surrounding parole suitability hearings. Only then, and after much deference is paid to the state courts, can a petition for habeas corpus be granted. Unfortunately, the written decisions of the two courts are barely more extensive than a pro forma denial. The Superior Court decision, Petitioner's Exhibit M, simply concludes that there is some evidence, after citing the relevant cases, and is written on less than a page.[3] The appellate court affirmance, Exhibit M, is even shorter and more conclusory. Thus, there is nothing upon which

---

[3] The Superior Court was also unsure whether the Governor was basing his decision on petitioner's "unstable" social history.

the undersigned can focus his analysis to determine if there exist factors which the undersigned has not weighed carefully enough. In sum, the undersigned must conduct an independent (not de novo) review of the Governor's analysis. Having re-read that analysis and comparing it to the undersigned's, a finding of AEDPA unreasonableness again must be recorded. A fair reading of the facts requires such a decision.

For the reasons discussed above, the court finds that the denial of petitioner's claims by the California Court of Appeal was an unreasonable application of clearly established Supreme Court authority. Petitioner's application for a petition for writ of habeas corpus should be granted.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: 12/4/06

/s/ Gregory G. Hollows

_____
GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

ggh:kj
toll2125.157